***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner DeLuca and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS *Page 2 
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and of the subject matter.
2. All parties were subject to the Workers' Compensation Act at the time of the alleged injury.
3. An employer/employee relationship existed between the parties at the time of the alleged injury.
4. The self-insured employer in this case is Cherry Hospital/DHHS and Corvel Corporation is the third-party administrator.
5. Plaintiff contends that he sustained an injury to his right foot on or about June 12, 2008.
6. Plaintiff contends that his average weekly wage is $737.33, which yields a compensation rate of $491.58, pursuant to a Form 22. Defendant contends plaintiff's average weekly wage was $681.35, with a corresponding compensation rate at $454.26, also pursuant to a Form 22.
7. Plaintiff last worked for defendant-employer on August 25, 2008. Plaintiff is still employed with defendant-employer and received short-term disability benefits from March 24, 2009 until September 30, 2009 in the amount of $1,321.88 per month. Plaintiff received a total of six monthly payments including one partial payment in the amount of $308.42.
8. The issues to be determined by the Full Commission are: whether plaintiff sustained a compensable injury by accident arising out of and in the course of employment on June 12, 2008; whether plaintiff is entitled to temporary total disability benefits until such time as he is provided with suitable employment; whether plaintiff's right foot condition and symptoms are causally related to the alleged June 12, 2008 injury; whether the incident *Page 3 
aggravated or exacerbated a pre-existing condition; and what is plaintiff's correct average weekly wage.
9. The parties stipulated to the admissibility of the following documents, which were received into evidence:
 (a) Exhibit 1: Pre-trial Agreement;
 (b) Exhibit 2: Medical Records, Discovery, Industrial Commission Forms, Personnel Files and Recorded Statement;
 (c) Exhibit 3: Disability Forms;
 (d) Defendant's Exhibit 1: Incident Report;
 (e) Defendant's Exhibit 2: Revised Form 22 and payroll information.
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was fifty years old. Plaintiff is approximately 6 feet 4 inches tall and weighs about 375 pounds. He is a high school graduate. Plaintiff worked at a factory for nine years after high school.
2. Plaintiff began working at defendant-employer Cherry Hospital on October 18, 1988. Plaintiff began employment at defendant-employer as a laundry worker and was later promoted to a healthcare technician. Plaintiff also worked as a transporter, transferring patients, before being placed in the healthcare technician position he held as of June 12, 2008.
3. Plaintiff's job duties as a healthcare technician included direct care of mentally ill patients, recognizing and responding to life-threatening situations, assisting with daily living *Page 4 
activities, and assisting medical providers with medical treatment. Plaintiff's job required a significant amount of standing and walking on tile and concrete.
4. Plaintiff was also responsible for responding to emergency alarms, which was a mandatory function of plaintiff's job. If an employee did not respond to emergency alarms, he or she could be terminated from employment.
5. On June 12, 2008, plaintiff was working on One East Ward of Cherry Hospital, where he was typically assigned to work. His duties required him to come into the ward to make sure all the patients were present before being provided with a report indicating what he was expected to do on that particular work day. This report included information about which employees were working and the wards to which they were assigned.
6. On June 12, 2008, there was an unusual or out of the ordinary staffing situation at Three West Ward, an all-male ward. The morning report indicated a shortage of male healthcare technicians in the building, which was very unusual. The report also indicated that there were more females and fewer males than normally worked on Three West Ward.
7. Plaintiff had worked on Three West Ward as a technician for 14 years. Patients who were dangerous to themselves or others and who were considered high risk were housed on that ward and an incident could escalate very quickly, if not handled properly. In the past a patient on the ward targeted female staff workers and assaulted one female worker.
8. There were typically five male technicians assigned to Three West Ward. More recently there had been four male technicians and one female technician assigned to that ward. However, on June 12, 2008, there were three female technicians and two male technicians assigned to that ward.
9. On June 12, 2008, an alarm went off between 8:30 and 8:40 a.m., indicating there *Page 5 
was an emergency on Three West Ward.
10. Plaintiff routinely responded to emergency alarms, but due to a heart condition he did not run while responding. Plaintiff has three stents in his heart. However, on June 12, 2008, plaintiff ran in response to the alarm because he felt there was a crisis situation due to the unusual staffing situation. Plaintiff stated that he knew that the workers needed help on the floor that day. He believed there was an increased risk of a possible dangerous situation. Plaintiff wanted to get to the ward as quickly as possible to help his coworkers.
11. Plaintiff ran through a hallway or "tunnel" that connects the wards and then ran up the stairway on the west wing. Plaintiff testified that he was "running with everything [he] had." When he arrived at the ward, he was informed that this was a false alarm.
12. Plaintiff testified and the Full Commission finds that in his normal, daily routine, he would have walked down the hallway and taken the elevator to go to Three West Ward, but on June 12, 2008, he ran down the hallway and up the stairs due to his concerns about the unusual staffing conditions.
13. When he reached the top of the stairs, plaintiff felt a tightness and pain in his right foot. After he was informed that it was a false alarm, he took the elevator back downstairs.
14. Plaintiff testified and the Full Commission finds that if the normal staffing pattern had been present on Three West Ward on June 12, 2008, plaintiff would have responded to the alarm in his normal fashion of walking down the corridor and taking the elevator, rather than running and taking the stairs.
15. Shareta Smith, a ward staff nurse at defendant-employer and plaintiff's supervisor, testified that on June 12, 2008, at around 9:00 a.m., she was approached by plaintiff who complained of swelling in his right lower extremity. Plaintiff indicated that he needed to go *Page 6 
to employee health for evaluation.
16. Immediately preceding June 12, 2008, plaintiff was not having problems with his right foot or ankle and was not treating with a doctor for any foot or ankle condition. Plaintiff had some arthritis in the foot prior to that time, but he was not being treated and was not symptomatic immediately prior to June 12, 2008.
17. Plaintiff presented to Employee Health at defendant-employer on June 12, 2008 for treatment. He was provided Motrin and a bandage to go on his ankle and some x-rays were taken. In spite of continued pain in his right ankle, plaintiff returned to regular work duties the next day.
18. Plaintiff treated at Employee Health on three occasions. He tried to continue working, but experienced discomfort and swelling in his right ankle. Plaintiff reported his ankle condition to defendant-employer and was provided pain medication and was sent back to work.
19. During the latter part of June 2008, plaintiff called and told his supervisor that he could not return to work, due to his ankle condition. Plaintiff was told to come in and see the doctor at defendant-employer.
20. When Dr. Clement McCaskill examined plaintiff's right leg and foot on July 2, 2008, he found that plaintiff had developed an infection. Upon examination, Dr. McCaskill noted that plaintiff's lower leg was swollen, red and painful with pressure and was warm to touch. Dr. McCaskill put plaintiff in the hospital and placed him on IV antibiotics.
21. Plaintiff called Debbie Coley, one of defendant-employer's healthcare technicians, to tell her that he was in the hospital.
22. On July 9, 2008, plaintiff was evaluated by Dr. William De Araujo at Goldsboro Orthopaedic Associates. Dr. De Araujo noted that plaintiff was released without work *Page 7 
restrictions for his right ankle. Dr. De Araujo also stressed that plaintiff needed to lose weight for his overall medical condition. On August 5, 2008, Dr. De Araujo assigned a 0% permanent partial impairment rating to plaintiff's right ankle.
23. Dr. McCaskill saw plaintiff on July 10, 2008, and found that plaintiff's infection had resolved, but that his right ankle problems had not. On that date, Dr. McCaskill diagnosed plaintiff with chronic ankle sprain and some associated arthritis. Dr. McCaskill assigned sedentary duty work restrictions for plaintiff at that time.
24. On July 22, 2008, Dr. McCaskill sent a note to Sheila Mozingo in human resources at defendant-employer indicating that it was his opinion that the problem that had caused plaintiff's hospitalization was the trauma of the ankle injury plaintiff sustained on June 12, 2008. Dr. McCaskill also noted that the resulting leg swelling caused skin fissures, which caused the cellulitis or infection in plaintiff's lower leg.
25. By July 25, 2008, the cellulitis in plaintiff's right lower leg had resolved. On August 13, 2008, plaintiff reported that he had returned to his full duty job. Dr. McCaskill testified that plaintiff's return to full duty work aggravated his problem and caused him to develop more pain and swelling in his ankle. Dr. McCaskill testified that he would be surprised if plaintiff had told him that he was able to do his full duty job.
26. When plaintiff returned to work, he started having more swelling problems with the foot. When plaintiff walked on the concrete floors, his foot became swollen. Plaintiff's job required him to walk up and down the concrete hallways constantly and this walking aggravated his foot condition.
27. Dr. McCaskill testified that any time plaintiff did a lot of ambulatory activity or work that required a lot of mobility, this activity was aggravating his problem and causing *Page 8 
swelling in his ankle and leg. On August 28, 2008, Dr. McCaskill took plaintiff out of work as a result of his leg and foot problems. Dr. McCaskill opined that plaintiff was not going to be able to continue to do his job, as his work duties aggravated his condition.
28. On October 28, 2008, Dr. McCaskill took plaintiff out of his job with defendant-employer on a permanent basis. Dr. McCaskill indicated plaintiff was not physically able to perform his job at defendant-employer and was permanently disabled from that job. The Full Commission finds Dr. McCaskill's opinions credible and gives great weight to his opinions.
29. Dr. McCaskill stated that plaintiff sustained a sprain or strain of the ankle. He further noted that the sprain or strain caused swelling, as it typically does, which caused fissure formation, or cracks in the skin, which led to the infection.
30. Dr. McCaskill opined that plaintiff's work-related injury of June 12, 2008 caused his current foot condition. He also opined to a reasonable degree of medical certainty that plaintiff's work-related injury on June 12, 2008 exacerbated, aggravated or worsened his pre-existing arthritis. The Full Commission finds Dr. McCaskill's opinion credible.
31. Dr. McCaskill indicated that plaintiff will not be able to perform any gainful employment that will require him to be on his feet doing any prolonged standing or walking. Dr. McCaskill stated that if plaintiff had to do this activity, his feet would swell and he would be in pain, which could increase his likelihood of contracting recurrent cellulitis and winding up as an amputee.
32. Dr. McCaskill indicated plaintiff has diabetic neuropathy, or nerve damage from diabetes, and this condition makes him more likely to experience an extremity injury. Dr. McCaskill also indicated after an injury to a lower extremity, plaintiff is more likely to contract a condition known as stasis dermatitis, where the blood pools in the lower extremity and does not *Page 9 
circulate as well, therefore causing swelling, as it did with plaintiff.
33. Plaintiff treated with Dr. Kevin Logel, an orthopedist at Raleigh Orthopaedic Clinic, on July 20, 2009. Dr. Logel opined that plaintiff had sustained an injury on June 12, 2008 while working for defendant-employer. Dr. Logel stated plaintiff was unable to work at the time he treated him.
34. Dr. Logel indicated x-rays revealed arthritis in the middle of plaintiff's foot. Dr. Logel stated plaintiff primarily complained of an ankle injury, but that x-rays revealed that the foot appeared more problematic than the ankle.
35. Dr. Logel stated there was the potential for exacerbation of pre-existing arthritis, as plaintiff was not having any problems with his foot immediately prior to June 12, 2008 and that one could assume that the swelling was a result of that exacerbation.
36. Dr. Logel referred to his July 20, 2009 note, when opining to a reasonable degree of medical certainty that "From the standpoint of his ankle and foot injuries being related to the work-related injury last June I certainly feel that his reporting of the injury was appropriate the day it occurred, and that it is feasible that a severe ankle inversion injury or foot sprain could have exacerbated some underlying arthritic changes and led them to become more persistently symptomatic."
37. Dr. Logel stated to a reasonable degree of medical certainty, in an opinion herein deemed credible and accepted as fact, that based on plaintiff's reporting of the incident and the history and his examination on July 20, 2009, plaintiff's symptoms were directly related to the work injury.
38. Dr. Logel assigned permanent work restrictions of sedentary work only, with no more than ten minutes of continuous walking or standing per hour. Dr. Logel noted that *Page 10 
plaintiff's right foot and ankle problems stemming from his work injury have made it difficult for him to ambulate with any comfort and that it was unlikely that he would be able to return in the future to a physical job, such as his pre-injury job.
39. Ms. Mozingo stated that after plaintiff stopped working at defendant-employer, he exhausted all of his vacation and sick leave before receiving short-term disability benefits on March 24, 2009, the date his vacation and sick leave expired. Ms. Mozingo stated that plaintiff started receiving long-term disability benefits on August 31, 2009.
40. The Full Commission finds that since August 25, 2008, plaintiff has been unable to earn any wages at any employment as a result of his injury of June 12, 2008.
41. Based upon Defendant's Exhibit 2, a revised Form 22 with its supporting documentation, plaintiff's average weekly wage is $681.35, which yields a compensation rate of $454.26.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes
the following:
 CONCLUSIONS OF LAW
1. It is settled law in North Carolina that the "injury by accident" requirement of N.C. Gen. Stat. § 97-2(6) can be satisfied when a plaintiff is injured due to an extra or unusual degree of exertion, in that this can constitute an unforeseen or unusual event or condition. Calderwood v. Charlotte-MecklenburgHosp. Auth., 135 N.C. App. 112, 519 S.E.2d 61 (1999), disc.review denied, 351 N.C. 351, 543 S.E.2d 124 (2000);Jackson v. Fayetteville Area Sys. of Transpt.,88 N.C. App. 123, 362 S.E.2d 569 (1987). *Page 11 
2. Furthermore, our courts have held that an injury is compensable if it is caused by an accident that arises out of employment, materially accelerates or aggravates a pre-existing condition, and proximately contributes to disability. Brown v. Family DollarDistrib. Ctr.,129 N.C. App. 361, 364, 499 S.E.2d 197, 199 (1998).
3. On June 12, 2008, plaintiff responded to an alarm in an unusual manner, considering his pre-existing health conditions, by running down the hall and up steps and putting forth an unusual amount of exertion during an unusual staffing situation. This combination of factors constituted an unexpected event that resulted in a deviation or interruption from his normal work routine, and resulted in an injury to his right foot. Plaintiff's work duties and the conditions experienced on this date during the response to an alarm constituted an interruption of plaintiff's normal work routine and the introduction thereby of conditions likely to result in unexpected consequences. N.C. Gen. Stat. § 97-2(6); Harding v.Thomas Howard Co., 256 N.C. 427, 124 S.E.2d 109 (1962). Plaintiff's unusual work duties and consequent extra and unusual amount of exertion on June 12, 2008 thereby resulted in plaintiff's injury. N.C. Gen. Stat. § 97-2(6); Calderwood v.Charlotte-Mecklenburg Hosp. Auth., supra; Jackson v.Fayetteville Area Sys. of Transpt., supra. This compensable injury by accident caused plaintiff's right foot condition or materially accelerated or aggravated a pre-existing non-disabling condition. N.C. Gen. Stat. § 97-2(6); Brown v. Family DollarDistrib. Ctr., supra.
4. In order to meet the burden of proving continuing disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following four ways: (1) the production of *Page 12 
medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of pre-existing conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury.Demery v. Perdue Farms, Inc.,143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v. Lowe'sProduct Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). When a plaintiff meets his burden of showing disability, the burden then shifts to defendant to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms., Inc.,supra.On June 12, 2008, plaintiff suffered a compensable injury by accident while working for defendant-employer. N.C. Gen. Stat. § 97-2(6).
5. Based on the medical evidence, as the result of the work-related injury plaintiff was physically unable to earn any wages in his former employment with defendant-employer or in any other employment from July 2, 2008 to August 5, 2008 and from August 28, 2008 and continuing. N.C. Gen. Stat. § 97-29;Russell v. Lowe's Products Dist.,108 N.C. App. 762, 765-66, 462 S.E.2d 454, 457 (1993).
6. As the result of the compensable injury by accident, plaintiff was disabled and entitled to payment by defendant of temporary total disability compensation at the rate of $454.26 per week from July 2, 2008 to August 5, 2008 and from August 25, 2008 and continuing until plaintiff returns to work or further Order of the Commission. N.C. Gen. Stat. § 97-29. *Page 13 
7. Plaintiff is entitled to have defendant provide all medical treatment, incurred or to be incurred, necessitated by the June 12, 2008 compensable injury, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, provide relief or lessen the period of disability. N.C. Gen. Stat. §§ 97-25; 97-25.1. Dr. Kevin Logel should be approved as plaintiff's authorized treating physician and orthopedist.
8. Defendant is entitled to a credit for short term disability benefits and long term
disability benefits paid to plaintiff. N.C. Gen. Stat. § 97-42.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. Subject to the attorney's fees approved below, defendant shall pay plaintiff temporary total disability compensation at the rate of $454.26 per week during plaintiff's absence from work due to his compensable injury from the period of July 2, 2008 to August 5, 2008, and again from August 28, 2008 and continuing until plaintiff returns to work or further Order of the Industrial Commission. Any amount that has accrued shall be paid in a lump sum.
2. Defendant shall pay all related medical expenses incurred or to be incurred by plaintiff as the result of his compensable injury by accident sustained on June 12, 2008.
3. Dr. Kevin Logel is approved as plaintiff's authorized treating physician and orthopedist for his compensable ankle and foot injury.
4. A reasonable attorney's fee in the amount of 25% of the compensation due plaintiff under Paragraph One of this Award is approved for plaintiff's counsel. Defendant shall *Page 14 
pay 25% of any amount that has accrued in a lump sum directly to plaintiff's counsel. Thereafter, defendant shall pay plaintiff's counsel every fourth compensation check due plaintiff.
5. Defendant is entitled to a credit for short term disability benefits and long term disability benefits paid to plaintiff.
6. Defendant shall bear the costs.
This 27th day of October, 2010.
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ LINDA CHEATHAM COMMISSIONER
 S/_____________ STACI T. MEYER COMMISSIONER